IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 12, 2020

## JUAN VARGAS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1410     Cheryl A. Blackburn, Judge**

_____

**No. M2019-00620-CCA-R3-PC**

_____

A Davidson County jury convicted Petitioner, Juan Vargas, of first degree murder, and the trial court sentenced him to life in prison. Petitioner appealed, and this court affirmed his conviction on direct appeal. Petitioner filed a pro se Post-Conviction Petition, and after a hearing, the post-conviction court denied relief. On appeal, Petitioner argues that ineffective assistance of counsel and prosecutorial misconduct require a new trial. After a thorough review of the record and applicable case law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Timothy Carter, Nashville, Tennessee, for the appellant, Juan Vargas.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Doug Thurman, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

On direct appeal, this court summarized the testimony presented at Petitioner's trial as follows:

[Petitioner] and his brother were indicted by the Davidson County Grand Jury in April of 2010 for first degree murder and employing a firearm during the commission of a dangerous felony. The incident giving rise to the indictment occurred on March 1, 2010, inside Las Potrancas Bar on Haywood Lane where Manual Santos Reyes, the victim, was shot. He died from a gunshot wound to the head several days later.

Ahmad El-Assuli, a licensed armed security guard, was employed by the owner of the bar, which was primarily patronized by Spanish-speaking customers. At the time of the incident he had worked there approximately eight months. His job required him to search the customers coming in for "[a]ny guns, any weapons" and to "maintain[ ] peace inside the bar and watch[ ] the customers." Mr. El-Assuli did not speak Spanish.

On the evening of Sunday, February 28, 2010, business was slow inside the small bar, which was located in a building that used to be a Waffle House. A few "regular" customers, including the victim and his friend, Antonio Hernandez, were inside the bar playing pool. The victim was dating one of the servers, Laura Cervantes.

Around 9:00 p.m., Mr. El-Assuli searched a man entering the bar. He did not recognize the man, who sat with several of his friends at a table in the back corner of the bar near the pool table. Mr. El-Assuli did not see any interaction between the men seated at the table and the victim during the evening.

Around 2:15 a.m., Mr. El-Assuli checked the bathroom to make sure it was empty because it was approaching closing time. When he exited the bathroom, he saw the man get up from his table in the far corner of the bar and walk toward the exit door. According to Mr. El-Assuli, the man stopped near the pool table and "looked like he said something" to the victim, possibly even whispering it to him. Mr. El-Assuli thought the interaction between the two men lasted anywhere from ten to thirty seconds. Then, the man pulled a gun from his waistband, pointed it to the victim's head, and pulled the trigger.

Mr. El-Assuli testified that he pulled out his gun, pointed it at the man and pulled the trigger before realizing that the safety was engaged. Mr. El-Assuli quickly put his gun back in the holster, "hoping" that the man did not see him because the man's "friends got all around him," trying to take him outside. The man "climb[ed] on top of [his friends]" and pointed

his gun at Mr. El-Assuli and tried to shoot him three times, but "[o]ne of [the man's] friends pull[ed] him down."

The group left the bar. Mr. El-Assuli waited for about thirty seconds before going outside. He saw them get into a maroon Impala with temporary tags. He was unable to see who was driving but watched the car make a U-turn and drive slowly through the parking lot past the front of the bar. Mr. El-Assuli drew his pistol and fired a warning shot at the car, hoping to scare them and draw the attention of police. Mr. El-Assuli then called police and an ambulance. Once the men left, he went back inside the bar to help the victim, who was still alive.

Mr. El-Assuli's hunch regarding his warning shot was correct. Officer James Thomas was nearby investigating an abandoned vehicle and heard a gunshot coming from the direction of Las Potrancas. Officer Thomas arrived in time to see a dark-colored Impala pull out of the parking lot.

The victim was still alive when the ambulance arrived but later died as a result of a single gunshot wound to the head. Dr. Erin Carney, a forensic pathologist, testified the shot was fired from an "indeterminate range."

As part of the investigation, Mr. El-Assuli met with detectives from the Metropolitan Nashville Police Department. Mr. El-Assuli was shown several photographic lineups. In one, he identified the person who pulled down the shooter's arm. In another lineup, Mr. El-Assuli identified the shooter as the man "in the bottom row in the middle." Mr. El-Assuli explained that the photograph of the man he identified as the shooter was labeled "5" on the lineup but [that] the lineup form he signed indicated that he identified photograph "6." Mr. El-Assuli explained that the officer "just got the wrong number [on the lineup form]" because both the man in photograph "5" and the man in photograph "6" had the first name "Juan." Mr. El-Assuli insisted that he picked out the person in position "5" on the lineup, the picture "in the bottom row in the middle," identified as [Petitioner]. Detective Derry Baltimore confirmed that Mr. El-Assuli picked out [Petitioner]'s photograph, in position "5" on the lineup but that he made a mistake and improperly wrote "No. 6" on the lineup form that was later signed by Mr. El-Assuli. When asked, Mr. El-Assuli was unable to identify [Petitioner] at trial.

- 3 -

Mr. Hernandez was playing pool with the victim the night of his death. There were not very many people at Las Potrancas that night, and he was not paying much attention to any of the men sitting at the table in the back corner of the bar. Mr. Hernandez saw the group get up to leave the bar and "saw that they just walked by the billiard table and they shot." It appeared as if the victim moved his head as if he were talking to someone before he was shot. However, Mr. Hernandez was unable to identify the shooter. Mr. Hernandez saw the men get into a car with temporary tags. He was unable to identify [Petitioner] at trial.

Ms. Cervantes, a bartender at Las Potrancas, was the victim's girlfriend. Ms. Cervantes dated the victim for approximately two years prior to his death. The night of the shooting, the victim came to the bar around 7:00 p.m. when Ms. Cervantes reported for work. He spent the night playing pool with Mr. Hernandez. When Ms. Cervantes heard the gunshot, she was in the midst of clearing empty beer bottles from the bar area. She immediately threw her body down to the ground behind the bar and was unable to see who shot the victim. When she got up from her hiding place, she saw a person leaving the bar with a gun in his hand. He was being followed by other people.

Ms. Cervantes met with police the day after the incident. She was able to identify [Petitioner]'s brother, Aldofo Vargas, from a photographic lineup. She knew that he was [Petitioner]'s brother from conversation at the bar. In another photographic lineup, Ms. Cervantes identified [Petitioner] stating that "he looks like [the person holding the pistol]." Ms. Cervantes did not see who fired the shot.

Debora Caferri was one of [Petitioner]'s close friends. She was "close to dating" [Petitioner] for nine or ten months prior to the incident. Around 4:00 or 5:00 a.m. on March 1, 2010, she received a phone call from [Petitioner]. During the conversation, [Petitioner] told her that he was leaving town "because him and his brother, they had got in some trouble and that a man was being killed. So they had to leave the country right away." [Petitioner] told her,

> [s]omething about that they were at Potrancas Bar and he was with his friends, and the guy was playing pool, and I guess there were some mean looks. The guy was looking at them the wrong way and they were just about to get in a fight . . . and that's when the shooting happened.

- 4 -

Ms. Caferri stated it was possible [Petitioner] told her "we" shot somebody. [Petitioner] called a few days later to tell her that he was in Missouri using a different name. She could not remember if he was going by the name "Pedro" or "Fernando."

Ms. Caferri was able to tell officers that [Petitioner] lived with his brother and other relatives at an address in Nashville and that they drove a "dark red four-door" car. At trial, she explained that [Petitioner] looked different at trial than he did in 2010 because he had gained weight, had longer hair, more facial hair, and his skin was lighter.

Police executed a search warrant at the residence where [Petitioner] was living. They located an international driver's license belonging to [Petitioner]. The driver's license photograph was used to prepare the photographic lineups used by police. Several days later, police found a maroon Chevy Impala parked in the backyard of the Vargas home. The car had temporary tags and contained a sales receipt showing that [Petitioner] purchased the car.

[Petitioner] was eventually apprehended in 2014. He testified at trial that he was drinking at Las Potrancas on the night of the shooting for about three or four hours with his brother and a friend. When they got up to leave, he "saw that somebody was shot." [Petitioner] claimed that he was not close to the person when the shooting happened and did not know who shot the person. [Petitioner] insisted that he was drunk and did not really understand what happened. He remembered getting to the car and that his brother drove him home that night. [Petitioner] admitted that he called Ms. Caferri and told her about the "accident" and he "thought that [his] brother and the other guy they had shot somebody" but that he "wasn't sure about what had happened." [Petitioner] told Ms. Caferri that he was going to work where he "was doing tile in bathrooms." [Petitioner] continued to work for about three more days before he was "detained with a fake ID and . . . deported." [Petitioner] went back to Mexico for four or five months before illegally returning to the United States.

[Petitioner] denied having a gun at the bar or shooting the victim. He explained that someone fired the gun over his shoulder. He left the bar with the people who were sitting at his table. As they were leaving, his brother "hugged" him. He denied that his brother grabbed his arm. [Petitioner] stipulated that as part of the investigation, police identified

- 5 -

[Petitioner]'s latent fingerprints from a beer bottle collected from Las Potrancas Bar.

*State v. Juan Diego Vargas*, No. M2015-02458-CCA-R3-CD, 2017 WL 678839, at *1-3 (Tenn. Crim. App. Feb. 21, 2017), *perm. app. denied* (Tenn. June 7, 2017). "At the conclusion of the testimony, the jury found [Petitioner] guilty of first degree murder." *Id*. at *3. "According to the judgment form, the trial court dismissed count three of the indictment, which charged [Petitioner] with employing a firearm during a dangerous felony, and sentenced [Petitioner] to life in prison." *Id*. "After the denial of a motion for new trial, [Petitioner] appealed, arguing that there was insufficient evidence to sustain his conviction." *Id*. This court affirmed the judgment of the trial court on direct appeal. *Id*. at *1.

Petitioner filed a timely pro se Post-Conviction Petition. The trial court appointed counsel to represent Petitioner, and counsel filed two amended Post-Conviction Petitions, arguing ineffective assistance of counsel, a due process violation,[1] a violation of Petitioner's constitutional rights by the trial court's denial of a continuance, State prosecutorial misconduct through multiple interruptions during defense counsel's closing arguments, and failure to sequester the jury.

At the post-conviction hearing, trial counsel testified that he represented Petitioner during his trial in September of 2015. He said that, in preparing for trial, he spoke with two different witnesses who had dated the victim. Trial counsel stated that he did not remember speaking with Mercedes Pacheco or watching a recorded interview of her but that he would have watched a video if one existed. He said that he was able to speak with Mr. El-Assuli in the courthouse hallway the morning of trial. Trial counsel stated that, in an effort to impeach Mr. El-Assuli's testimony, he asked him why he was unable to identify Petitioner at trial.

Trial counsel said that he did not subpoena any witnesses. He said that Petitioner's brother, Co-Defendant Adolpho Vargas, went to Mexico and was unavailable to testify. He stated that one material witness, "Mr. Hernandez[,] indicated [that] he did not see anything." Trial counsel pointed out during cross-examination of Ms. Caferri that Petitioner's statement to her regarding the shooting was "inclusive of himself and his brother, not just [']I killed somebody[.']" He stated that he did not recall whether he

---

[1] Petitioner argued that, because Tennessee Supreme Court Rule 13 section 5 requires a petitioner to obtain the services of an expert witness in order to be granted post-conviction relief under an argument that trial counsel failed to call an expert witness, and because Tennessee Supreme Court Rule 13 section 5 also prohibits funds to retain expert witnesses for indigent petitioners except in capital cases, an indigent petitioner in any other case does not have the same access to justice as non-indigent petitioners who have the funds to retain expert witnesses.

- 6 -

cross-examined State witnesses Detective Scott Sulfridge and Investigator Sharon Tilley. When asked whether, after Ms. Rhonda Evans testified, he "stipulated to the rest of the scientific evidence[,]" trial counsel responded, "If that's what it says in the record."

Trial counsel testified that he did not recall how many times he visited Petitioner prior to trial or whether Petitioner contacted him via letter or phone call. He did not recall whether he discussed with Petitioner what other witnesses would be testifying to but stated that he was "sure [he] did." Trial counsel stated that he discussed with Petitioner possible defenses and plea bargains. He did not recall whether he discussed with Petitioner his right to testify on his own behalf but stated that it was his standard procedure to do so.

Trial counsel recalled questioning Petitioner about his border crossings during direct examination because it was "something [he] believe[d] the jury was fully aware of" but that he was "not sure why [he] asked or what the context was." He knew that Ms. Caferri had already testified that Petitioner left the country after the shooting, so he believed Petitioner's illegal border crossing "was kind of already out there at that point." Trial counsel stated, "And then also the [S]tate had introduced some evidence in the form of pictures that had been taken upon his reentry into the country[.]" He agreed that Petitioner's legal status had not been brought up by the time he questioned Petitioner regarding his illegal border crossings. He did not know whether Petitioner had an Immigration and Customs Enforcement (ICE) "hold" at that time and did not recall if he filed any pretrial motions regarding ICE.

Trial counsel stated that Petitioner "always indicated to [him] that he did not need a translator," so he only used a translator at trial. He said that his relationship with Petitioner was "fine" and that he was sure that Petitioner asked questions.

Trial counsel did not recall whether he filed a motion for a continuance prior to trial. He remembered speaking with Dr. Jeffrey Neuchatz prior to trial as a possible expert witness "[t]o discuss if there [were] any issues with identification that he could help to assist the defense." After discussions with Dr. Neuchatz, trial counsel concluded that Dr. Neuchatz would not have been a beneficial witness because he saw no issues with the identification. He decided that "it would've been detrimental . . . to put him on the stand." The post-conviction court asked trial counsel, "[D]o you remember that we were working around Dr. Neuchatz's schedule? . . . Which is why you filed your motion to continue. And then we managed to be able to get him here by working with his schedule, [but] you then said you didn't need him." Trial counsel responded, "Yes. Correct, Judge."

- 7 -

Trial counsel did not recall whether the State made several objections during his closing argument, and he did not recall what he was "trying to convey with [his] closing argument." He testified that he heard that "something was said" to the jury by someone outside the courtroom but that he did not see it.

Regarding Petitioner's direct appeal, trial counsel stated that the issue of the photographic lineup was addressed as a sufficiency of the evidence question.

On cross-examination, trial counsel stated that, prior to Petitioner's trial, he had tried ten to twelve other murder trials and had been practicing law about twelve years. He testified that he had filed several motions to suppress and motions in limine in his career. Trial counsel stated that Detective Derry Baltimore's inadvertent error in writing down the wrong number from the photographic lineup was something he chose to exploit in front of the jury because Mr. El-Assuli could not later identify Petitioner. Moreover, he said that "there was nothing that was overly suggestive" involved in the lineup for him to be able to file a pretrial motion to suppress. Trial counsel stated that Mr. El-Assuli's inability to identify Petitioner as the shooter was a "better strategy" to use in front of the jury.

Trial counsel testified that he cross-examined Ms. Caferri regarding Petitioner's statement to her that "they" had shot someone and believed that was "pretty damaging evidence." He stated that, in his understanding, the person who addressed the jury out of court made the statement "find the person not guilty." Trial counsel said that, if he had learned that the person had told the jurors to find Petitioner "guilty," then he "absolutely would [have]" filed a motion regarding that statement. He said that the trial court asked each juror individually whether the person's out-of-court statement to them had any affect.

Trial counsel stated that, at trial, Petitioner admitted to being at the bar on the night of the murder. Trial counsel's theory of the case was that "someone behind him reached over him with a gun and fired."

Petitioner testified through a Spanish-language interpreter. He stated that trial counsel communicated with him "very little" during the course of his representation and that trial counsel visited him in jail "three or four times." Petitioner stated that he asked trial counsel to withdraw because "he was making a bigger effort on finding me guilty than on what the case was actually." He said that trial counsel sent a private investigator to "pressure" him to plead guilty by playing a recording of the preliminary hearing where Petitioner's brother was testifying. Petitioner stated that trial counsel spoke to him regarding testifying "a few minutes before" he actually testified. He said that trial counsel "told [him] that [he] needed to testify, that [he] had to testify." Petitioner

testified that the plea offer trial counsel presented him with was "forty or life" and that his current sentence was life in prison.

On cross-examination, Petitioner stated that he reviewed some of the discovery, but because it was in English, he did not understand all of it. Prior to trial, he knew that Ms. Caferri and the security guard were going to testify against him, but he did not know that Ms. Cervantes was a potential witness. Petitioner stated that, when he asked trial counsel to withdraw, trial counsel refused. He agreed that, prior to his testimony at trial, he had never told trial counsel that someone else fired the shot. Petitioner stated that he never asked trial counsel to investigate or interview anyone as a witness.

On redirect examination, Petitioner testified that someone at the prison helped him draft some motions to the court discussing trial counsel's representation and that Petitioner wanted trial counsel to file certain motions on Petitioner's behalf.

On rebuttal, trial counsel testified that he reviewed with Petitioner the potential State witnesses' testimonies. He said that the State's plea offer was either twelve or fifteen years and that he conveyed that to Petitioner several times. Trial counsel stated that he hired a private investigator to try to "find people" to see if there were "any angles" that trial counsel could pursue. He said that he went over the discovery with Petitioner because he knew that Petitioner could not read English. Trial counsel stated that he discussed whether to testify with Petitioner prior to trial and that it was Petitioner's decision.

Post-conviction counsel stated to the court that he attempted to locate Mercedes Pacheco for the post-conviction hearing but was unsuccessful.

In its written order, the post-conviction court denied Petitioner's Post-Conviction Petition. The court concluded that trial counsel's actions did not fall below the objective standard of reasonableness under prevailing professional norms and that, even if it had, Petitioner had not shown prejudice. The post-conviction court credited the testimony of trial counsel and stated that "[n]othing in the record indicates that [t]rial [c]ounsel failed to meet with [P]etitioner and keep him informed of the proceedings." It stated that, in regards to trial counsel's questioning on Petitioner's legal status, Petitioner did not show that trial counsel was ineffective, and even if he had made that showing, Petitioner "still ha[d] not demonstrated how he was prejudiced by his self-admissions of illegally entering the country." The post-conviction court stated that trial counsel was not deficient for not filing a pretrial motion to suppress the photographic lineup identification because he planned to use Mr. El-Assuli's failure to identify Petitioner to the defense's advantage.

Regarding Petitioner's constitutional claims, the post-conviction court determined that Petitioner did not establish that he was prejudiced by the trial court's denial of the motion to continue the trial to accommodate his expert witness because trial counsel explained that the expert witness's testimony would have been detrimental to the defense. The post-conviction court concluded that Petitioner waived his prosecutorial misconduct claim by not raising it on direct appeal. Nevertheless, the post-conviction court addressed the merits of the prosecutorial misconduct claim and stated that Petitioner's claim did not qualify as prosecutorial misconduct under *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

Regarding Petitioner's jury sequestration claim, the post-conviction court found that Petitioner did not establish by clear and convincing evidence that either the hallway outburst or his lack of opportunity to question the individual who made the outburst prejudiced him.

Regarding Petitioner's due process claim, the post-conviction court noted that a petitioner did not have a constitutional right to investigative or to expert services at post-conviction. The court noted that some petitioners do have a statutory right to such services but that the statutory right was exclusive to petitioners in capital cases. Moreover, the post-conviction court found that Petitioner had access to funds for an expert witness at trial, but his trial counsel strategically chose not to use the expert witness.

This timely appeal follows.

## Analysis

### I. Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579);

*see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

## II. Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

## A. Failure to Investigate

Petitioner argues that trial counsel was ineffective for failing to investigate the evidence of a bar fight on the night of the murder and whether "other violent suspects known to frequent the bar" were present and had possible motives to harm the victim. The State responds that trial counsel met with Petitioner, hired an investigator who also met with Petitioner, and contacted numerous witnesses prior to trial. Thus, the State contends, Petitioner has not shown deficiency or prejudice.

### *1. Other Violent Suspects*

Initially, we note that Petitioner did not raise in his petition or address at the post-conviction hearing his claim that trial counsel failed to investigate whether "other violent suspects known to frequent the bar" were present at the time of the murder. "As a general rule, this court will not address post-conviction issues that were not raised in the petition or addressed in the trial court." *Brown v. State*, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996) (citing *State v. Smith,* 814 S.W.2d 45, 49 (Tenn. 1991)). Because Petitioner failed to raise this issue below, thereby depriving the post-conviction court of the opportunity to adjudicate this claim, our consideration of the issue is waived. Petitioner is not entitled to relief on this basis.

### *2. Bar Fight*

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. Here, Petitioner claims that trial counsel was ineffective for his failure to investigate a "bar fight," yet Petitioner proffered no evidence that the shooting was related to a bar fight. If a petitioner's claim "is based on a failure to properly investigate, then the evidence or witness must be produced so that the post-conviction court judge can properly evaluate the evidence or the witness." *Demarcus Sheriff Smith v. State*, No. W2001-01353-CCA-R3-PC, 2002 WL 1482697, at *4 (Tenn. Crim. App. Mar. 8, 2002) (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "This court may not speculate as to what evidence could have been proven in the absence of clear and convincing evidence." *Id*. Because Petitioner did not produce evidence at the post-conviction hearing that a "bar fight" was related to the shooting, Petitioner has failed to show deficient performance or prejudice. Petitioner is not entitled to relief.

## B. Eliciting Prejudicial Testimony

Petitioner argues that trial counsel was ineffective when he elicited prejudicial testimony from Petitioner on direct examination. Petitioner claims that trial counsel's

questioning forced him to admit to criminal activity that was not at issue in the trial, thus denying him a right to a fair trial. He claims that trial counsel should have discussed "any issues with illegal border crossing" in "pretrial motions." The State responds that Petitioner has not established trial counsel's deficiency or any prejudice to Petitioner's case.

"Because a petitioner must establish both prongs of the test to prevail on a claim of ineffective assistance of counsel, failure to prove either deficient performance or resulting prejudice provides a sufficient basis to deny relief on the claim." *Henley*, 960 S.W.2d at 580. We agree with the post-conviction court that, even if trial counsel was deficient in his questioning, Petitioner has not shown that such deficiency prejudiced him. Petitioner presented no evidence that, absent his testimony that he was "deported" and returned illegally, the result of his trial would have been different. Indeed, the fact that he was forcibly removed from the country and subsequently reentered bolstered the defense theory that he was not fleeing a crime. Petitioner has failed to show a reasonable probability that, but for trial counsel's eliciting Petitioner's mention of an illegal border crossing, the result of his trial would have been different, especially when considering the abundance of evidence of Petitioner's guilt. He is not entitled to relief.

### C. Failure to File Motions to Suppress Co-Defendant's Statements and Petitioner's Photographic Lineup Identification

Petitioner argues that trial counsel was ineffective for failing to file a motion to suppress the hearsay statements of his Co-Defendant, Adolfo Vargas, that Petitioner had "left the jurisdiction," which Petitioner claims was introduced at trial by "detectives." He claims that the improper admission of Co-Defendant Vargas's statement violated "*Bruton[ v. United States*, 391 U.S. 123 (1968)], *Crawford[ v. Washington*, 541 U.S. 36 (2004)], and the Confrontation Clause of the [Sixth] Amendment" of the United States Constitution because Co-Defendant Vargas was not subject to cross-examination. Petitioner also argues that trial counsel was ineffective for failing to file a motion to suppress Mr. El-Assuli's identification of Petitioner from a photographic lineup. Because an officer incorrectly labeled the lineup form, the State questioned Detective Derry Baltimore as to whom Mr. El-Assuli identified during the lineup, and Petitioner argues this was inadmissible hearsay.

The State responds that no such statement was made by detectives and that, even if such a statement had been made, Ms. Caferri had already testified to the fact that Petitioner had left the jurisdiction. Thus, any admission of a hearsay statement through the detective was harmless. The State also contends that trial counsel had no reason to attempt to suppress the photographic lineup because two witnesses testified that the

incorrect mark on the lineup form was a mistake. Moreover, trial counsel planned to use Mr. El-Assuli's inability to identify Petitioner to impeach his testimony.

The State is correct that no hearsay statement by any detective is found in the record, either on direct appeal or post-conviction appeal.[2] Moreover, Petitioner's brief does not cite to any place in the record where a detective testified that Co-Defendant Vargas made a statement that Petitioner left the jurisdiction. Petitioner cites only to this exchange during the direct examination of Detective Baltimore:

[THE STATE]: Did you ask anyone if [Petitioner] was there?

[DET. BALTIMORE]: Yes, I asked [Co-Defendant Vargas] was [Petitioner] there. I asked his brother was he there, and he told me no.

Clearly, Detective Baltimore did not testify as to a statement by Co-Defendant Vargas that Petitioner had "left the jurisdiction." Thus, trial counsel had no reason to file a motion to suppress or to object to a statement that did not exist. Trial counsel was not deficient, and Petitioner is not entitled to relief on this claim.

Regarding Petitioner's claim that trial counsel was ineffective by failing to file a pretrial motion to suppress the photographic lineup, the post-conviction court properly denied Petitioner's claim. To establish that trial counsel's failure to file a pretrial motion to suppress evidence resulted in prejudice, a petitioner "must show by clear and convincing evidence that (1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested." *Terrance Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at * 8 (Tenn. Crim. App. Sept. 12, 2011) (citing *Vaughn v. State*, 202 S.W.3d 106, 120 (Tenn. 2006)), *no perm. app. filed*. "In essence, a petitioner should present a motion to suppress hearing within the petitioner's evidentiary hearing." *Danny Santarone v. State*, No. E2018-01312-CCA-R3-PC, 2019 WL 6487419, at *10 (Tenn. Crim. App. Dec. 2, 2019), *no perm. app. filed*.

Trial counsel testified that he wanted to use Mr. El-Assuli's inconsistencies to impeach his testimony, that there was nothing suggestive about the photographic lineup, and that he saw no legal basis to file a suppression motion. The post-conviction court credited trial counsel's testimony. When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for

---

[2] To assist in the resolution of this proceeding, we take judicial notice of the record from the Petitioner's direct appeal. *See* Tenn. R. App. P. 13(c); *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009); *Delbridge v. State*, 742 S.W.2d 266, 267 (Tenn. 1987); *State ex rel Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964).

those drawn by the post-conviction court. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 578). Petitioner has not shown that "(1) a motion to suppress would have been granted and (2) there was a reasonable probability that the proceedings would have concluded differently if counsel had performed as suggested." *Terrance Cecil*, 2011 WL 4012436, at * 8. He is not entitled to relief.

### III. Prosecutorial Misconduct

Petitioner argues that excessive objections by the State during trial counsel's closing arguments "prejudice[ed] [Petitioner] by not providing a clear summary of the defense's view of the events in question." The State responds that Petitioner has waived this issue and that Petitioner has failed to prove that the State's objections during closing statements were so improper as to materially affect the verdict.

Under the Post-Conviction Procedure Act:

A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless: (1) [t]he claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or (2) [t]he failure to present the ground was the result of state action in violation of the federal or state constitution.

Tenn. Code Ann. § 40-30-106(g); *see Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004); *Black*, 794 S.W.2d at 756.

In *Christopher Lee Blunkall v. State*, this court noted that

[i]t is well established that a party may not raise an issue in a post-conviction petition that could have been raised on direct appeal. *State v. Townes*, 56 S.W.3d 30, 35 (Tenn. Crim. App. 2000), *overruled on other grounds by State v. Terry*, 118 S.W.3d 355 (Tenn. 2003). Pursuant to the Post-Conviction Procedure Act, "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]" Tenn. Code Ann. § 40-30-106(g).

- 15 -

No. M2017-01038-CCA-R3-PC, 2019 WL 104136, at *41 (Tenn. Crim. App. Jan. 4, 2019), *perm. app. denied* (Tenn. Apr. 11, 2019).

Here, Petitioner had the opportunity to raise this issue on direct appeal and failed to do so. The issue is waived pursuant to Tennessee Code Annotated section 40-30-106(g).

## **Conclusion**

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE